FILED

2008 Aug 06 AM 10:03

Page 1

CLERK U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

LEXSEE 2008 BANKR LEXIS 1739

In re: MARGARET ODELL GUNTER, Debtor. Margaret Odell Gunter, Plaintiff, v. Kevin O'Brien & Associates Co. LPA, Defendant.

Case No. 02-58527, Chapter 7, Adv. Pro. No. 05-2257

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

389 B.R. 67; 2008 Bankr. LEXIS 1739

June 17, 2008, Decided

**PRIOR HISTORY:** *Gunter v. Columbus Check Cashiers, Inc. (In re Gunter), 334 B.R. 900, 2005 Bankr. LEXIS 2582 (Bankr. S.D. Ohio, 2005)*

**COUNSEL:** [*1] For Margaret Odell Gunter (2:02-bk-58527), Debtor: James E Nobile, Nobile & Thompson Co., L.P.A., Hilliard, OH; Stephen E Schafer, Columbus, OH.

For Margaret Odell Gunter (2:05-ap-02257), Plaintiff: James E Nobile, LEAD ATTORNEY, Nobile & Thompson Co., L.P.A., Hilliard, OH.

For Kevin O'Brien & Associates Co LPA (2:05-ap-02257), Defendant: Alvin E Mathews, Jr, Columbus, OH; James E Nobile, Nobile & Thompson Co., L.P.A., Hilliard, OH.

For Columbus Check Cashers Inc (2:05-ap-02257), Defendant: Holly P Regoli, Jerrold W Schwarz, LEAD ATTORNEY, Pickerington, OH.

**JUDGES:** C. Kathryn Preston, United States Bankruptcy Judge.

**OPINION BY:** C. Kathryn Preston

**OPINION**

MEMORANDUM OPINION ON COMPLAINT FOR CONTEMPT AND SANCTIONS FOR VIOLATIONS OF THE DISCHARGE INJUNCTION

**I. Introduction**

This cause came on for trial on March 17, 2008 on Count I of the Complaint of Plaintiff-Debtor Margaret Odell Gunter ("Gunter" or "Debtor") seeking to sanction Defendant Kevin O'Brien & Associates Co. LPA ("O'Brien Firm") for violations of the discharge injunction set forth in *11 U.S.C. § 524(a)(2)*. Present at the trial were Gunter and her attorney, James E. Nobile ("Nobile"), as well as Kevin O'Brien ("O'Brien")--the principal of the O'Brien Firm--and [*2] its attorney, Alvin E. Mathews, Jr. The Court has jurisdiction over this matter pursuant to *28 U.S.C. §§ 157* and *1334* and the general order of reference entered in this district. This is a core proceeding pursuant to *28 U.S.C. § 157(b)(2)(A)* and *(O)*.

By attempting to collect a discharged debt from Gunter and obtaining a judgment against her post-discharge, the O'Brien Firm violated the discharge injunction. Violations of the discharge injunction, however, are sanctionable only if they rise to the level of contempt. The O'Brien Firm's violations were not contemptuous. The Court, therefore, cannot enter a judgment in Gunter's favor.

**II. Background**

**A. Findings of Fact**

Based on the evidence adduced at trial, the Court finds as follows:

In early 2002, Gunter defaulted on a loan she had obtained from Columbus Check Cashers, Inc. ("CCC").

Page 2

389 B.R. 67; 2008 Bankr. LEXIS 1739, *2

On July 3, 2002, she filed a Petition for Relief under Chapter 7 of the Bankruptcy Code and included CCC on her Schedule F (Creditors Holding Unsecured Nonpriority Claims). Because O'Brien does collections work for several check cashing companies, consumer bankruptcy attorneys sometimes include him on service lists for new bankruptcy cases in which a check cashing [*3] company is a creditor, whether or not his firm has been retained to collect from the debtor. So too did Stephen E. Schafer ("Schafer"), Gunter's bankruptcy counsel, and O'Brien presumably was served with notice of the Debtor's bankruptcy petition. In due course, Gunter was granted a discharge ("Discharge") (Case No. 02-58527, Doc. 12), which discharged, among other debts, her debt to CCC, and it and the O'Brien Firm presumably were served with notice of the Discharge. The O'Brien Firm, however, had not yet opened a collection file pertaining to Gunter, nor did it have any reason to do so given that CCC had not yet referred Gunter's account to it for collection.

Over a year later, CCC sent to the O'Brien Firm several accounts for collection, among them the Gunter account. It was only then, in December 2003, that the O'Brien Firm opened a collection file pertaining to Gunter. Consistent with its procedures in place at the time, the O'Brien Firm did not check PACER or any other source to determine whether Gunter had commenced a bankruptcy case.[1] In December 2003, the O'Brien Firm sent Gunter a letter demanding payment of the amount due plus collection charges. She did not respond to that [*4] letter. In February 2004, the O'Brien Firm sent Gunter another letter stating that it intended to file a civil action against her if she did not pay the amount due or enter into an agreement to pay it. The O'Brien Firm also left at least one message for Gunter at her place of employment. She did not respond to any of these communications or have anyone do so on her behalf.

> 1 "PACER" is an acronym for Public Access to Court Electronic Records. It is an electronic public access service that allows users to obtain case and docket information from the federal courts, including the bankruptcy courts. Among other things, it allows interested parties to determine whether an individual has commenced a bankruptcy case.

In November 2004, the O'Brien Firm, on behalf of CCC, commenced a lawsuit against Gunter in the Franklin County, Ohio Municipal Court ("Municipal Court). Later that month, Gunter contacted Schafer regarding the lawsuit. On December 1, 2004 -- one day before the Municipal Court was scheduled to hear the matter -- Schafer filed with the Municipal Court a Notification of Filing Under Bankruptcy Code and Automatic Stay and Discharge Injunction ("Notification"). Schafer's secretary sent [*5] the Notification by telecopy both to the Municipal Court and to the O'Brien Firm. In lieu of using cover sheets or retaining facsimile confirmation sheets, Schafer's secretary would stamp a successfully-transmitted document as "FAXED" and handwrite the date she faxed it on the face of the document. Gunter introduced into evidence a copy of the Notification on the face of which appeared a "FAXED" stamp and the handwritten date of December 1, 2004. Absent, however, was any indication as to whom the fax was sent or the time it was faxed. O'Brien denied that he or his firm ever received the Notification, by telecopy or by ordinary U.S. mail.

Because Schafer's office had faxed the Notification both to the O'Brien Firm and to the Municipal Court, neither Schafer nor Gunter attended the trial. Unfortunately, although the Notification arrived at the Municipal Court via fax on December 1, 2004, it did not make its way to the magistrate assigned to the case in time to prevent the trial from going forward. On December 2, 2004, the magistrate issued a default judgment against Gunter, which was entered on December 6, 2004. About a week later, a garnishment was served on Gunter. For reasons not explained [*6] at the trial before this Court, Gunter's wages were never actually garnished.

On January 1, 2005, the O'Brien Firm instituted a new office procedure under which, prior to filing a complaint against an individual or garnishing his or her wages, it would routinely check PACER to determine whether the individual had commenced a bankruptcy case. On January 5, 2005, an employee of the O'Brien Firm checked PACER and learned of Gunter's Chapter 7 case. The employee made a notation of the bankruptcy on the firm's computer database so that no further enforcement action would be taken against Gunter. None was. In March 2005, Nobile sent a letter to O'Brien outlining Gunter's claims against CCC and the O'Brien Firm. The letter stated that Gunter expected CCC and the O'Brien Firm to immediately cause the Municipal Court

Page 3

389 B.R. 67; 2008 Bankr. LEXIS 1739, *6

to vacate the judgment with prejudice. Upon receiving the letter, O'Brien advised the Municipal Court of Gunter's bankruptcy case and, on March 24, 2005, the Municipal Court vacated its judgment with prejudice. Shortly thereafter, O'Brien provided Nobile with a copy of the entry vacating the judgment.

### B. Procedural History of this Adversary Proceeding

The legal wrangling that ensued [*7] has consumed considerable judicial resources. In March 2005, Gunter filed a motion to reopen her bankruptcy case, which the then-presiding judge, Judge Donald E. Calhoun, Jr., granted. In May 2005, Gunter commenced this adversary proceeding, asserting causes of action against the O'Brien Firm and CCC for invasion of Gunter's privacy and violations of both the discharge injunction and the FDCPA; the Complaint sought damages in an amount exceeding $ 25,000. [2] Gunter eventually filed a stipulation of dismissal as to its claims against CCC (Doc. 46) in exchange for $ 2,000. The O'Brien Firm filed a motion to dismiss the cause of action under the FDCPA (Doc. 11), which Judge Calhoun denied after a hearing. *See Gunter v. Columbus Check Cashiers, Inc. (In re Gunter), 334 B.R. 900 (Bankr. S.D. Ohio 2005).* In May 2006, the O'Brien Firm filed a motion for summary judgment (Doc. 34), and Gunter filed a response and a cross-motion for partial summary judgment (Docs. 48 & 54). In January 2007, Judge Calhoun entered an order granting summary judgment in favor of the O'Brien Firm on the invasion of privacy cause of action but denying summary judgment to all parties on the claims based on the discharge [*8] injunction and the FDCPA (Doc. 57). On April 17, 2007, the O'Brien Firm filed a motion requesting that the United States District Court for the Southern District of Ohio ("District Court") withdraw the reference of the adversary proceeding on, among other grounds, the asserted right to a jury trial on Count II, the cause of action brought under the Fair Debt Collection Practices Act ("FDCPA") (Doc. 63). The District Court entered an order denying that motion without prejudice to renewal following resolution of the cause of action for violation of the discharge injunction. Following the District Court's denial of the O'Brien Firm's motion to withdraw the reference, this Court held a full-day trial on the cause of action for violation of the discharge injunction (Count I of the Complaint).

  2  The amount of the Municipal Court judgment was $ 970.25 plus court costs.

### III. Discussion

The ultimate issue in this adversary proceeding is whether the Court may hold the O'Brien Firm liable for violating the discharge injunction set forth in *11 U.S.C. § 524(a)(2)*. That statute states in pertinent part:

> (a) A discharge in a case under this title--
>
> (2) operates as an injunction against the commencement [*9] or continuation of an action, the employment of process, or an act, to collect, recover or offset any [discharged] debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]

*11 U.S.C. § 524(a)(2).*

With respect to discharged debts, this injunction replaces the automatic stay set forth in *§ 362(a)* of actions to pursue collection of debts from the debtor personally. *See Ung v. Boni (In re Boni), 240 B.R. 381, 384 n.5 (B.A.P. 9th Cir. 1999)* ("When the debtor receives a discharge, although the automatic stay of acts against the debtor expires, it is replaced by the discharge injunction."); *In re Perviz, 302 B.R. 357, 369 (Bankr. N.D. Ohio 2003)* ("*[Section] 524(a)(2)* simply makes permanent what had previously been temporary under *§ 362(a)(6)*."). Unlike *§ 362*, [3] however, *§ 524* does not include an enforcement mechanism. As a result, damages are not available in private actions to enforce the discharge injunction. *See Pertuso v. Ford Motor Credit Co., 233 F.3d 417, 423 (6th Cir. 2000).* Rather, a debtor's only recourse for violation of the discharge injunction is to request that the offending party be held in contempt of court. *See Pertuso, 233 F.3d at 421* ("The [*10] obvious purpose [of *§ 524(a)(2)*] is to enjoin the proscribed conduct--and the traditional remedy for violation of an injunction lies in contempt proceedings, not in a lawsuit such as this one."). If contempt is present, the court may sanction it by awarding damages and attorneys fees to the debtor. *See TWM Mfg. Co. v. Dura Corp., 722 F.2d 1261, 1273 (6th Cir. 1983)* ("The award of attorney's fees and expenses to a successful movant may be appropriate in a civil contempt proceeding."); *Duling v. First Fed. Bank of the Midwest (In re Duling), 360 B.R. 643, 645 (Bankr. N.D. Ohio 2006)* ("The sanctions imposed by a court may include an award of damages to the debtor, including

389 B.R. 67; 2008 Bankr. LEXIS 1739, *10

Page 4

reasonable attorney fees.").

> 3  Under § 362(k), "an individual injured by any willful violation of [the automatic stay] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

To prevail in a civil contempt proceeding, a plaintiff must prove that the defendant "'violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.'" *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 550 (6th Cir. 2006) [*11] (quoting *Glover v. Johnson*, 934 F.2d 703, 707 (6th Cir. 1991)). In the context of the discharge injunction, this means that the debtor must demonstrate that the defendant (i) violated the discharge injunction (and thus the order granting the discharge) and (ii) did so with knowledge that the injunction was in place. *See In re Franks*, 363 B.R. 839, 843 (Bankr. N.D. Ohio 2006). The plaintiff bears the burden of proving both elements--violation and knowledge--by clear and convincing evidence. *See Liberte Capital Group*, 462 F.3d at 550. Although some courts have held that constructive knowledge can give rise to contempt, [4] other courts, including the Sixth Circuit, have required actual knowledge. *See Newman v. Ethridge (In re Newman)*, 803 F.2d 721 (table), 1986 WL 17762 at *1 (6th Cir. 1986) ("Notice of the bankruptcy need not be formal; the court is to look to whether the creditor had actual knowledge."); *Franks*, 363 B.R. at 843.

> 4  *See Cultrera v. People's Bank (In re Cultrera)*, 360 B.R. 28, 31 (Bankr. D. Conn. 2007).

There is no serious dispute that the O'Brien Firm violated the discharge injunction prior to January 5, 2005 when it sent collection letters to Gunter, attempted to contact [*12] her at work, obtained a judgment against her and caused the issuance of a garnishment, all in an attempt to collect a discharged debt. Instead, the first question is whether the O'Brien Firm had knowledge of Gunter's discharge prior to January 5. By contrast, there is no question that the O'Brien Firm had knowledge of Gunter's Discharge as of January 5, 2005. Therefore, the second question is whether the O'Brien Firm's delay in requesting that the Municipal Court vacate the default judgment was a separate violation of the discharge injunction.

### A. The O'Brien Firm's Knowledge Prior to January 5, 2005

Gunter propounds two theories for charging the O'Brien Firm with knowledge of the Discharge prior to January 5, 2005. [5] First, Gunter insists that the O'Brien Firm had notice of Gunter's bankruptcy case and Discharge, pointing to the Notification that Schafer's office faxed to the O'Brien Firm. If Gunter had shown that the O'Brien Firm received the fax, then the Court could conclude that the O'Brien Firm had actual knowledge of the Discharge. Gunter, however, failed to prove that O'Brien or the O'Brien Firm received the Notification by fax at any time, let alone prior to the hearing in the [*13] Municipal Court. Unlike the "mailbox rule," [6] evidence of transmission of a document by fax, such as the "FAXED" stamp here, does not create a presumption of receipt. *See Riley & Ephriam Constr. Co. v. United States*, 408 F.3d 1369, 1372 (Fed. Cir. 2005)("[W]e cannot infer receipt from evidence of transmission. Proof of message exit from a transmitting machine cannot serve as a proxy for proof of actual receipt of the sent message by a remote receiving terminal."). Without deciding the issue, the Court notes that the evidence that might have given rise to a presumption of receipt includes: (i) a fax confirmation sheet [7] or (ii) a telephone call to the O'Brien Firm confirming receipt. [8] Schaffers's office, however, employed neither of those methods. [9]

> 5  Although the notices sent to the O'Brien Firm in the early stages of Gunter's bankruptcy case engendered extensive testimony, Gunter is not relying on those notices in support of her argument that the O'Brien Firm had knowledge of her discharge prior to January 5, 2005. If she did, the Court would be hard pressed to charge the O'Brien Firm with knowledge on the basis of information it received more than a year before it opened a file pertaining [*14] to her.
>
> 6  Under this rule, a presumption of receipt "arises upon proof that the item was addressed properly, had sufficient postage, and was deposited in the mail. *Bratton v. Yoder Co. (In re Yoder Co.)*, 758 F.2d 1114, 1118 (6th Cir. 1985).
>
> 7  *See Brickwood Contractors, Inc. v. United States*, 77 Fed. Cl. 624, 631 (Fed. Cir. 2007) (noting that some courts have held that "a fax confirmation sheet creates a rebuttable presumption that the fax was received" but

389 B.R. 67; 2008 Bankr. LEXIS 1739, *14

Page 5

ultimately declining to follow that view).

8  *See Brickwood Contractors, 77 Fed. Cl. at 632* ("All the [fax sender] has to do is make a simple telephone call to the [recipient] or its authorized representative to affirm actual receipt of the fax. This simple step would give the [sender] assurance of actual receipt . . . .") (quoting *Riley, 408 F.3d at 1373*).

9  Aside from this, the lack of certain information regarding the faxing of the Notification deleteriously impacts the credibility and weight of the copy Gunter presented at trial: the notation made by Schafer's secretary does not include the fax number(s) to which the Notification was sent or the time of day it was faxed. Moreover, the certificate of service on the Notification certifies [*15] only that service was made by ordinary U.S. mail.

Second, Gunter points to the O'Brien Firm's collection practices prior to January 1, 2005 and attempts to paint them as an example of a "plausible deniability" scheme. By this, she presumably means the practice of acting (or failing to act) in a manner, sometimes through one or more intermediaries, such that later denial of any wrongdoing, or at least knowledge of the wrongdoing, is ostensibly plausible. As far as the Court is aware, the term "plausible deniability" does not appear in the body of case law regarding violations of the discharge injunction or the automatic stay. The concept, however, fits those situations in which a creditor, with knowledge of the discharge injunction, turns a discharged debt over to a third party (*e.g,* an assignee or collections agent) without informing the third party of the discharge. In such instances, courts have held the creditor liable for violating the discharge injunction on the grounds that the creditor knew the debt would be collected and therefore should have advised the third party of the discharge. *See In re Lafferty, 229 B.R. 707, 714 (Bankr. N.D. Ohio 1998); Walker v. M&M Dodge, Inc. (In re Walker), 180 B.R. 834, 845 (Bankr. W.D. La. 1995);* [*16] *In re Roush, 88 B.R. 163, 164 (Bankr. S.D. Ohio 1988).* Conversely, courts have held debt collectors liable for violating the discharge injunction where they cavalierly disregard evidence that the debt assigned or referred to it may have been discharged. *See Lafferty, 229 B.R. at 715* ("[F]rom the point that it learned that the portfolio transferred to it pursuant to the Agreement contained numerous accounts that had been discharged in bankruptcy and it did not pause in its collection march nor take immediate actions to reverse collection efforts on bankruptcy discharged accounts, [the assignee's] action violated the discharge injunction."). Otherwise, the creditor and the collector could whipsaw the debtor, with the creditor denying liability on the basis that it had not itself taken any action against the debtor and the debt collector denying liability on the ground that it had no knowledge of the discharge. In the instant case, however, Gunter failed to present evidence that the O'Brien Firm had any reason, such as past experience with CCC indicating that it made a practice of attempting to collect discharged debts, to believe that the debt may have been discharged.

In support of her [*17] plausible deniability theory, Gunter points out that the O'Brien Firm failed to check PACER or any other source to determine whether Gunter had filed a bankruptcy petition and argues that the firm should be charged with the knowledge such a search would have provided. The O'Brien Firm now routinely checks PACER for bankruptcy filings before commencing a lawsuit or garnishing wages, which is certainly a prudent practice. A debt collection firm, however, generally does not have a duty to determine whether an individual from whom it is attempting to collect has commenced a bankruptcy case, [10] and it would be unreasonable to expect collection firms to do so in every instance. *Cf. Hyman v. Tate, 362 F.3d 965, 968 (7th Cir. 2004)* ("[The FDCPA] only requires collectors to adopt reasonable procedures, and . . . it would not be reasonable to require [the collections agency] to independently confirm that the accounts forwarded by the bank were not in bankruptcy, where the bank, in the first instance, limited the accounts forwarded to those not in bankruptcy."). The burden this would impose is evident in this case: an "All Courts" search on PACER of the name "Margaret Gunter" -- not a very common [*18] name -- produces 13 results in eight different courts, only two of which are for the Debtor. It is not difficult to imagine that, of the thousands of individuals to whom the typical debt collector sends letters, many of them--even though not in bankruptcy themselves--will have the same name as one or more persons who have commenced a bankruptcy case.

10  *See Waswick v. Stutsman County Bank (In re Waswick), 212 B.R. 350, 353 (Bankr. D.N.D. 1997).*

Gunter presented no evidence that the O'Brien Firm

Page 6

389 B.R. 67; 2008 Bankr. LEXIS 1739, *18

had knowledge of the Discharge at the time that the firm obtained the default judgment against her or sent the garnishment notice. Nor did she show that the O'Brien Firm had knowledge of the Discharge at the time it sent the collection letters. If Gunter had shown that the O'Brien Firm received a single response to one of those communications, then the O'Brien Firm would have been in contempt had it continued to pursue collection activities. *See Bigham v. Equip. Leasing Specialists, Inc., 1999 U.S. Dist. LEXIS 15883, 1999 WL 1005709, at *4 (W.D. Mich. 1999)* ("Notably, neither [the debtor] nor his counsel took any steps to contact [the collections attorney] by telephone to explain that the debt had been discharged even though [*19] her office telephone number was readily available."). As it is, Gunter failed to demonstrate that the O'Brien Firm's actions prior to January 5, 2005 were contemptuous. *See Kanipe v. First Tennessee Bank (In re Kanipe), 293 B.R. 750, 756 (Bankr. E.D. Tenn. 2002)* ("[T]he court must conclude that [the creditor] did not have knowledge of the debtors' bankruptcy case at the time its attorney levied upon the debtors' bank account . . . . As such, although a violation of the discharge injunction occurred, the violation was not willful and therefore not contemptuous.").

### B. The O'Brien Firm's Delay Post-January 5, 2005

Gunter also contends that the O'Brien Firm violated the discharge injunction when it learned of the Discharge but delayed for approximately two months before requesting that the Municipal Court vacate its judgment. In support of this argument, Gunter relies on cases in which courts have held that violations of the automatic stay had occurred because: (i) the defendant failed to return property of the debtor; [11] or (ii) the defendant's inaction resulted in continued garnishment of the debtor's wages. [12] By contrast, although the O'Brien Firm sent a garnishment notice to Gunter [*20] prior to January 5, 2005, Gunter's wages were never actually garnished, and the O'Brien Firm never obtained or kept any property belonging to Gunter.

> 11 *See In re Holman, 92 B.R. 764, 768 (Bankr. S.D. Ohio 1988); In re Dungey, 99 B.R. 814, 816 (Bankr. S.D. Ohio 1989).*
> 12 *See Dubin v. Jakobowski (In re Stephen W. Grosse, P.C.), 68 B.R. 847, 850 (Bankr. E.D. Pa. 1987); Elder v. City of Thomasville (In re Elder), 12 B.R. 491, 496 (Bankr. M.D. Ga. 1981).*

True, courts have held that inaction violates the discharge injunction if the defendant's motive in failing to act was to collect the discharged debt. *See Curtis v. Salem Five Mortg. Co., LLC (In re Curtis), 2007 Bankr. LEXIS 627, 2007 WL 628093 at *5 (B.A.P. 1st Cir. Feb. 28, 2007)* ("[A] variety of somewhat passive acts are potentially violations of the discharge injunction if they are objectively coercive or coercive in effect."); *Lohmeyer v. Alvin's Jewelers (In re Lohmeyer), 365 B.R. 746, 750 (Bankr. N.D. Ohio 2007)* ("If [the debtors] can prove that Defendant inaccurately reported or failed to update the status of the debt as a current liability of [the debtors] . . . for the purpose of coercing payment by [the debtors] notwithstanding the discharge, which would [*21] essentially amount to lying in passive wait, then in this court's view a violation of the discharge injunction will have occurred without other overt collection action such as letters or harassing telephone calls.") Gunter, however, presented no evidence that the O'Brien Firm delayed in vacating the default judgment in order to lie in wait and passively coerce her to pay the discharged debt. Rather, the O'Brien Firm closed Gunter's file and took no further collection actions after it learned of her discharge. No injury to Gunter resulted from the inaction. [13] Ultimately, although there was some delay in having the default judgment vacated, O'Brien did cause the judgment to be vacated without the intervention of this Court, and the Debtor suffered no damages as a result of the O'Brien Firm's activities after January 5, 2005.

> 13 Gunter testified that, in addition to attorney fees and costs, she incurred damages of lost wages for three days of absence from work (including the leave she requested in anticipation of attending the trial), stress, and the exacerbation of certain medical conditions. Other than the attorney fees and costs, however, it appears that any damages she incurred arose [*22] prior to the time that the O'Brien Firm obtained knowledge of her discharge. She did not testify to any damages caused by the entry of the default judgment or its remaining of record.

### IV. Conclusion

In light of the Sixth Circuit's holding in *Pertuso*, this Court cannot award damages for violations of the discharge injunction that are technical or inadvertent and do not rise to the level of contempt. It bears noting that this does not leave Gunter without any remedy at all for the violations of the discharge injunction that occurred.

389 B.R. 67; 2008 Bankr. LEXIS 1739, *22

Page 7

Gunter settled with CCC for $ 2,000, which in the Court's view covered her reasonable attorneys' fees and any damages she incurred.

In closing, the Court reiterates the admonishment Judge Sellers gave nearly two decades ago:

> [Allegations that] creditors . . . refuse to honor either the automatic stay or the discharge injunction . . . will always [receive] serious attention [from the Court]. But the unnecessary escalation of a matter of somewhat limited consequence which could have been resolved by much less lawyering does not make economic or emotional sense. Such escalation creates damages, magnifies costs, and burdens the system. More significantly, such efforts [*23] reveal a lack of perspective.

*In re Newell*, 117 B.R. 323, 326 (Bankr. S.D. Ohio 1990).

In light of the foregoing, the Court concludes that it cannot enter judgment in favor of Gunter on Count I, the cause of action for the O'Brien Firm's violation of the discharge injunction. The Court will enter a separate judgment entry in accordance with this memorandum opinion.

**IT IS SO ORDERED.**

**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**

**Dated: June 17, 2008**

/s/ C. Kathryn Preston

**C. Kathryn Preston**

**United States Bankruptcy Judge**

LEXSEE 2007 US DIST LEXIS 29363

SAINT TORRANCE, a/k/a TORRANCE D. SMITH, Plaintiff, v. SELECT PORTFOLIO SERVICING, INC., et al., Defendants.

NO. 1:06-CV-00490

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

2007 U.S. Dist. LEXIS 29363

April 19, 2007, Decided
April 20, 2007, Filed

**COUNSEL:** [*1] Saint Torrance also known as Torrance D. Smith, Plaintiff, Pro se, Cincinnati, OH.

For Select Portfolio Servicing, Inc. formerly known as Fairbanks Capital Corporation, Defendant: Jeffrey Douglas Siehl, LEAD ATTORNEY, Squire, Sanders & Dempsey, L.L.P., Cincinnati, OH; Scott A Kane, LEAD ATTORNEY, Squire Sanders & Dempsey - 1, Cincinnati, OH.

For Westwood Civic Association, Defendant: Michael Richard Schmidt, LEAD ATTORNEY, Cohen Todd Kite & Stanford -1, Cincinnati, OH.

**JUDGES:** S. Arthur Spiegel, United States Senior District Judge.

**OPINION BY:** S. Arthur Spiegel

**OPINION**

**OPINION AND ORDER**

This matter is before the Court on the Report and Recommendation in which the assigned Magistrate Judge recommended that Defendant Select Portfolio Servicing's motion to dismiss be granted (doc. 11). For the reasons indicated herein, the Court ADOPTS the Magistrate Judge's Report and Recommendation in its entirety and GRANTS Defendant's motion to dismiss (doc. 5).

On August 6, 2006, Plaintiff Saint Torrance, a.k.a. Torrance D. Smith, filed a *pro se* Complaint against Defendants Select Portfolio Servicing, Inc. ("SPS") and Westwood Civic Association ("WCA") alleging "Bankruptcy Violations" under [*2] *28 U.S.C. § 524* (doc. 3). According to the Complaint, Plaintiff was the owner/mortgagor of property located on Westwood Northern Boulevard in Cincinnati, Ohio (doc. 3). After becoming insolvent in 2001, that property went into foreclosure (Id.). SPS was the mortgagee of the property and filed foreclosure proceedings against Plaintiff in May 2001 (Id.). In June 2002, SPS re-purchased Plaintiff's property at a sheriff's sale (Id.). Plaintiff filed for bankruptcy in September 2002, and SPS became a creditor to the bankruptcy action at that time (Id.). Plaintiff asserts that the property deed remained in his name until November 3, 2003 (Id.). Plaintiff alleges that SPS's failure to transfer the title to the property within a reasonable period of time resulted in frustrating Plaintiff's fresh start (Id.)[1].

> 1 Plaintiff's Complaint also alleges that during the time period that the title remained in Plaintiff's name, WCA continuously sent him post cards despite notifying them that he no longer owned the property (doc 3). Plaintiff contends that WCA's actions also violated his rights as established by the fresh start rule. WCA, however, is not a part of this Motion to Dismiss.

[*3] On August 21, 2006, SPS filed a Motion to Dismiss Pursuant to *Rule 12(b)(6)* and, in the Alternative, for a More Definite Statement (doc. 5). Plaintiff filed his Motion in Opposition to Defendant's Motion to Dismiss and a Motion to Amend his Complaint on September 12, 2006 (docs. 7, 8). SPS filed a response on September 25,

2006. The Magistrate Judge issued his Report and Recommendation February 7, 2007 (doc. 16). After this Court granted Plaintiff's Motion for Extension of Time to File Objections to the Report and Recommendation (doc. 12), Plaintiff filed an objection [2] to the Report and Recommendation on March 19, 2007 (doc. 15).

> 2  Plaintiff titled his motion a Motion for Reconsideration of the Court's Report and Recommendations of Dismissal and Request for Leave to Amend Complaint for a More Definite Statement (doc. 15). However, Plaintiff states that he filed his motion pursuant to *Fed. R. Civ. P. 72(b)* (Id.). Therefore, this Court will treat Plaintiff's Motion as an objection to the Magistrate Judge's Report and Recommendation.

[*4] SPS's motion to dismiss is based on Plaintiff's failure to state a claim for which relief can be granted (doc 5). SPS first argues that Plaintiff failed to allege that SPS owed him a legal duty (Id.). Second, SPS argues that even had the company owed Plaintiff a legal duty to timely transfer the deed, SPS timely transferred the deed following a Decree Ordering Transfer of Title dated November 3, 2003 (Id.).

In opposition, Plaintiff alleges that because his Complaint arises under the "Fresh Start Rule" and *11 U.S.C. § 524*, he does not have to identify a legal duty owed by Defendant (doc. 7). However, Plaintiff admits that the debtor-creditor relationship does not establish a general legal duty to timely record the deed (doc. 7).

The Magistrate Judge issued a Report and Recommendation finding Defendant's motion well-taken (doc. 16). After liberally construing Plaintiff's Complaint and reviewing the parties' arguments, the Magistrate Judge found that Plaintiff's Complaint failed to state a claim upon which relief can be granted (Id.). The Magistrate Judge reasoned that *11 U.S.C. § 524*, on which Plaintiff bases his claims, operates [*5] as an injunction against attempts to recover pre-petition obligations that have been discharged in a debtor's bankruptcy proceeding and has nothing to do with the timing of the recording of a deed (Id.). Therefore Plaintiff's allegations do not form a basis for a violation under *§ 524* (Id.). Additionally, because *§ 524* does not provide a private right of action, and because a debtor could only enforce an alleged violation in a contempt proceeding in the underlying bankruptcy action, relief cannot be granted under any of Plaintiff's claims (Id.).

In his objection, Plaintiff echos the claims laid out in his Complaint and argues that SPS's delay in transferring the deed harmed Plaintiff's credit thereby preventing him from investing, and from purchasing a home and a vehicle [3] (doc. 15). SPS responds by arguing that Plaintiff failed to allege that SPS attempted to collect or enforce a discharged obligation in violation of the Bankruptcy Code's fresh start principle, and that *11 U.S.C. § 524* does not provide for a private right of action (doc. 16). [4]

> 3  Plaintiff also attempts to add new claims that SPS improperly reported two separate accounts to credit reporting agencies which were owed by Plaintiff (doc. 15). Plaintiff failed to raise these issues in his Complaint and in his memorandum in opposition to SPS' motion to dismiss, therefore, Plaintiff waived his right to address them now. *Murr v. United States, 200 F.3d 895, 902 n. 1 (6th Cir. 2000)*.

[*6]
> 4  SPS additionally agues that Plaintiff should be prevented from raising new claims because they were waived. As the Court agrees with SPS, its argument does not need to be addressed.

Having reviewed this matter, the Court finds the Magistrate Judge's Report and Recommendation well-reasoned, thorough, and correct. The Bankruptcy Code carefully balances the debtor's and creditor's interests. In offering the debtor a fresh start, the Code allows the debtor to receive a "'new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" *80 Am. Bankr. L.J. 327, 366* citing *Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S. Ct. 695, 78 L. Ed. 1230 (1934)*. Section 524 operates as an injunction against creditors from commencing or continuing an action to recover a previously discharged debt. *11 U.S.C. § 524*.

Plaintiff's allegations that SPS untimely recorded the transfer of the deed neither constitutes an interference with Plaintiff's ability to obtain a fresh start, nor violates *§ 524* because Plaintiff does not allege [*7] that SPS attempted to collect, or enforce a previously discharged obligation. [5] Additionally, Plaintiff does not allege that SPS owed him a legal duty to timely transfer the deed. Finally, *§ 524* does not provide a private right of action for which Plaintiff may recover. See *Pertuso v. Ford Motor Credit Co., 233 F.3d 417, 421-23 (6th Cir. 2000)* (Finding that there is no statutory private right of action

for damages under *11 U.S.C. § 524*).

5   Plaintiff cites two different dates in which SPS transferred the deed out of his name. In his Complaint, Plaintiff alleges that SPS transferred the deed on November 3, 2003, the same date the Court of Common Pleas on the foreclosure case issued a Decree Ordering Transfer of Title (docs. 3, 5). However, in his objection, Plaintiff alleges that the property was not transferred until July 12, 2004 (doc. 15). Regardless of the transfer date, Plaintiff has failed to establish a violation under *§ 524* or an interference with his ability to obtain a fresh start.

[*8] Having reviewed this matter de novo pursuant to *28 U.S.C. § 636(b)*, the COURT ADOPTS the Magistrate Judge's Report and Recommendation (doc. 11) in its entirety, and therefore, GRANTS Defendant SPS's motion to dismiss (doc. 5).

SO ORDERED.

Dated: April 19, 2007

s/ S. Arthur Spiegel

United States Senior District Judge